Michael St. James, CSB No. 95653
ST. JAMES LAW, P.C.
155 Montgomery Street, Suite 1004
San Francisco, California 94104
(415) 391-7566 Telephone
(415) 391-7568 Facsimile
michael@stjames-law.com

Counsel for Theta Microelectronics, Inc.

## UNITED STATES BANKRUPTCY COURT

### FOR THE NORTHERN DISTRICT OF CALIFORNIA

San Jose Division

In re

THETA MICROELECTRONICS, INC.

Debtor

Case No.

Chapter 11

## DISCLOSURE STATEMENT

*To Accompany Plan of Reorganization Dated May 22, 2015*

# Table of Contents

I.     Introduction ........................................................................................ 1
II.    Summary of the Plan ......................................................................... 1
       A.    The IP Contract .................................................................... 1
       B.    The Exit Financing ............................................................... 2
       C.    The Plan of Reorganization .................................................. 2
III.   Voting ................................................................................................ 3
       A.    How to Vote ......................................................................... 3
       B.    Number and Amount of Votes Required to Confirm Plan ...... 3
IV     Background ........................................................................................ 4
       A.    Ancient History .................................................................... 4
       B.    Events Leading to the Bankruptcy Case .............................. 5
       C.    Theta's Intellectual Property ................................................ 6
V.     Creditors and Equity Holders ............................................................ 7
       A.    Secured Creditors ................................................................ 7
       B.    Unsecured Creditors ............................................................ 8
             1.    Accounts Payable ....................................................... 8
             2.    Convertible Notes ....................................................... 9
             3.    Executory (Ongoing) Contracts ................................. 10
       C.    Equity Holders .................................................................... 11
VI.    The Plan of Reorganization ................................................................ 12
       A.    Means of Implementing the Plan ........................................ 12
             1.    Theta IP, LLC ............................................................. 12
             2.    The IP Contract .......................................................... 14
             3.    Exit Financing ........................................................... 14
       B.    Plan Treatment .................................................................... 16
             1.    Secured Creditors ....................................................... 16
             2.    Priority Creditors ....................................................... 16
             3.    General Unsecured Creditors ...................................... 16
             4.    Preferred and Common Stockholders .......................... 17
VII    Tax Consequences .............................................................................. 19
VIII   Alternatives to the Plan ..................................................................... 20
       A.    Liquidation under Chapter 7 ................................................ 20
IX.    Feasibility .......................................................................................... 21
       A.    Grounds for Feasibility Finding ........................................... 21
       B.    Risk Factors ........................................................................ 22
X.     Disclosure of Post-Confirmation Management ................................... 23
XI     Conclusion ......................................................................................... 24

Attachment:   Budget

# I. INTRODUCTION

Theta Microelectronics, Inc. ("Theta" or the "Debtor") has proposed the accompanying Plan of Reorganization for consideration by its creditors and equity holders. This Disclosure Statement is presented to provide creditors and equity holders with information about the Debtor, the alternatives available for their repayment and the proposed Plan of Reorganization. The Debtor believes that the Debtor's Plan of Reorganization offers the only viable alternative to provide a return to creditors and equity holders.

Theta intends shortly to commence a case for reorganization under Chapter 11 of the Bankruptcy Code. After the case has been filed, creditors and equity holders will receive notice of the filing, of the deadline for submitting Ballots, and of the hearing on approval of the Disclosure Statement and confirmation of the Debtor's Plan of Reorganization.

# II. SUMMARY OF THE PLAN

The Plan has three components. First, it proposes to monetize the Debtor's patent portfolio through a contract with Theta IP, LLC (the "IP Contract"). Second, it proposes to raise exit financing through the issuance of Preferred Stock and debt, and to make certain adjustments in its capital structure relating to that issuance. Finally, it proposes to distribute the income stream to be derived from the IP Contract in the future, if Theta IP, LLC is successful, among creditors and equity holders.

## A. The IP Contract

As discussed further below, Theta IP, LLC has all of the elements necessary to implement and prosecute an assertive patent licensing campaign coupled with patent infringement litigation. In the absence of these elements, some of which might only be reproduced at very substantial expense and with considerable delay, the Debtor believes that its patents cannot be monetized. With the assistance of Theta IP, LLC, on the other hand, the Debtor believes that its patents can be monetized, thus producing a material recovery for creditors and equity holders.

In return for ownership of the patents, exclusive discretionary authority over the licensing effort and a payment of approximately $175,000, under the IP Contract, Theta IP, LLC offers to undertake to monetize the patent portfolio and to distribute to the Debtor 65.1% percent of the net revenues generated from the licensing effort, after payment of contingent litigation expenses and fees which are estimated at 50% of gross revenues. The Debtor believes that there is no viable alternative through which it can realize meaningful value from the patents other than through the IP Contract. A copy of the IP Contract is attached as Exhibit A to the Plan.

**B.    *The Exit Financing***

Theta expects to require an aggregate of about $400,000 operating capital through 2007, of which approximately $250,000 will be required in the current year, and a majority of that upon confirmation of its Plan of Reorganization, anticipate to occur within the next 60 days. Theta contemplates raising this financing (the "Exit Financing") through its bankruptcy reorganization process incorporated in the Plan of Reorganization.

Specifically, new Series 1 Preferred Stock will be issued to the Participants in the Exit Financing. Since the new financing will dilute existing classes of stock, the existing anti-dilution provisions respecting Series A and Series B Preferred Stock will be given effect. Existing Series A and Series B Preferred Stock will then be converted into Common Stock.

Current holders of Preferred Stock will be permitted to participate in the Exit Financing ratably based on the amount they have previously invested, and as part of that participation will receive Series 1 Preferred Stock. That Series 1 Preferred Stock will enjoy the approximately $10 million liquidation preference currently held by Series A and Series B Preferred Stockholders.

**C.    *Plan of Reorganization:***

The Debtor has approximately $73,000 in enforceable secured debts, which will be paid in full upon confirmation of the Plan from the proceeds of the Exit Financing.

The Debtor has general unsecured obligations including accounts payables, obligations associated with the 2004 and 2008 financings and certain ongoing contracts to which the Debtor is a party which will necessarily be rejected, potentially resulting in damage claims. The Debtor estimates that claims aggregating $5 million or more will be asserted.

Under the Plan, the revenues the Debtor receives under the IP Contract will be disbursed first to repay the Exit Financing; thereafter to repay general unsecured creditors' claims in full, together with post-bankruptcy interest; and thereafter in distributions to the holders of equity, first to the new Preferred Stock and then to pre-bankruptcy equity.

The Debtor believes that confirmation of the Plan of Reorganization affords creditors and equity holders the only viable opportunity to obtain the best available recovery. Creditors and equity holders are encouraged to vote on the Plan of Reorganization by returning the accompanying Ballot.

## III. VOTING

### A. How to Vote

A vote for acceptance or rejection of the Plan may be cast by completing and signing the ballot enclosed herewith and mailing it to St. James Law, P.C., 155 Montgomery Street, Suite 1004, San Francisco, California 94104. Ballots will also be accepted by fax to (415) 391-7568 or by .pdf, emailed to michael@stjames-law.com. The deadline for voting will be the subject of a separate notice, which will be mailed after the Chapter 11 case has been filed. Upon its confirmation, the Plan will be binding on all creditors regardless of whether a creditor has voted in favor of or rejected the Plan.

### B. Number and Amount of Votes Required to Confirm Plan

The Bankruptcy Code provides as follows with respect to the voting on the Plan:

✓ A class accepts the Plan if it is accepted by the affirmative votes of claimants holding Allowed Claims totaling at least two-thirds in amount and more than half in number of Allowed Claims in that class who vote (11 U.S.C. § 1126(c)).

✓ Either every impaired class must accept the Plan or the Court must confirm the Plan notwithstanding rejection by one or more impaired classes pursuant to 11 U.S.C.§ 1129(b), which requires the Court to find that the Plan does not discriminate unfairly and is fair and equitable with respect to each class of claims that is impaired under and has not accepted the Plan.

Class 3 and Class 4 are impaired by the Plan. Creditors who cast dissenting votes in any of these classes are further protected by Bankruptcy Code Section 1129(a)(7)(A)(ii), which specifies that each dissenting creditor must receive or retain on account of its claim property of a value, as of the Effective Date, that is not less than the amount that the holder would receive or retain were Theta liquidated under Chapter 7 of the Bankruptcy Code.

## IV.    BACKGROUND

### A.    *Ancient History*

Theta Microelectronics, Inc. ("Theta" or the "Debtor") was founded in 2001 by two university professors with substantial skills and experience in integrated circuit ("IC") development for wireless communications applications. This category of ICs is generally referred to as wireless radio transceivers. The two founders are Dr. Yannis Tsividis (Columbia University) and Dr. Yannis Papananos (National Technical University of Athens).

In the first phase of its development, Theta raised a significant amount of capital from venture capital investors in California's Silicon Valley and from Greek investors in Athens. The expectation during this phase was that Theta would develop IC products that would be sold to system manufacturers who were participating in the wireless communications revolution. The investment capital was deployed to fund an engineering development team located in Athens, Greece and a management, sales, marketing and production testing group in San Jose, California. These efforts to build a product-based business were unsuccessful and resulted in a shutdown of the San Jose business operations in 2005.

Thereafter, the engineering team in Athens, Greece began looking for systems company clients who wanted custom-designed wireless transceiver ICs developed for their electronic systems products. At the start of this second phase, the Athens team was well-known and well-regarded for their unique skills in the development of these very complex wireless transceiver IC products. With the help of a California-based consulting firm who provided the sales and marketing expertise, a series of custom-design services clients were located. Unfortunately, the Athens engineering team did not perform well on the design services contracts in terms of project schedules or budgets. The quality of the designs was exceptional, but the difficulties in meeting schedule commitments made it impossible to build a sustainable custom-design services business. Over time the size and capabilities of the engineering team decreased to the point that shutdown of the engineering operation became inevitable. The last design services contracts were funded by European Union/Greek Government grant programs. There is no value in the Greek subsidiary to be recovered by the Debtor.

The shutdown of the Athens engineering operation left the company with only one possible path for generating a return for Theta's creditors and Stockholders – the monetization of the company's patent portfolio. That effort was commenced pre-petition and represents the strategy on which Theta's reorganization is premised.

### B. Events Leading to the Bankruptcy Case

In the summer of 2014, Theta undertook to complete the preparation of the necessary infrastructure for an assertive patent licensing program. Theta engaged in efforts to obtain patent litigation counsel and to arrange for the funding of the assertive patent licensing program. Theta believed that it was on the verge of commencing its assertive patent licensing program.

In September of 2014, a lawsuit was filed by the general manager of the Athens subsidiary, Mikes Sisois. The lawsuit sought to recover consulting fees owed to Sisois. (Although Sisois' contract was a consulting agreement, Sisois' lawsuit contended that he was an employee.) While there are

disputes about the amount owed and more significant disputes about the availability of interest, Theta's principal objection was that there were no funds to pay Sisois and other creditors until the patents were monetized, and Theta understood that Sisois and other similarly situated creditors had agreed to defer payment until the patents were monetized. The pendency of Sisois' lawsuit prevented Theta from embarking on the assertive patent licensing program, and consequently prevented the patents from being monetized.

Theta attempted to negotiate a settlement involving a deferred payment that would enable Theta to embark upon efforts to monetize the patents, but those efforts proved unsuccessful. The instant Plan of Reorganization is proposed in order to prevent Sisois' claims from impeding monetization of the patents and to ensure that the proceeds of the assertive patent licensing program are distributed equitably among all holders of claims against and interests in Theta.

### C. *Theta's Intellectual Property*

The Debtor has no material assets other than its patents. The Debtor's patents are identified in the Schedule to Plan Exhibit A.

Theta has concluded that at least one of its patents, and its descendants, has been and continues to be infringed by more than one large electronics systems company. This conclusion was based on the extensive and proprietary efforts of Nif/T, LLC, a California consulting company which undertook to identify and substantiate the patent infringement (the "Infringement Substantiation"). (Earlier, when Theta's Athens engineering group was delivering custom design services, Nif/T, LLC was helping Theta identify, document and file patent applications for key inventions pursuant to a separate consulting agreement.)

Based on the Infringement Substantiation, Theta undertook preliminary efforts to plan and implement an assertive patent licensing program premised upon commencing infringement litigation against infringers who did not agree to license its patents. In order to ensure that the infringement

litigation would be successful, Theta entered into agreements to pay a percentage of recoveries to obtain essential assistance from, e.g., Nif/T, LLC and the founders.

As noted, the pendency of the Sisois litigation prevented Theta from proceeding with the assertive patent licensing program.

## V. CREDITORS AND EQUITY HOLDERS

### A. *Secured Creditors*

The Debtor believes that the only creditors who hold enforceable liens against its assets are the participants in the recent pre-bankruptcy financing.

On April 15, 2015, the Debtor borrowed $73,000 from a group of persons (the "Secured Note Holders") in exchange for Secured Notes.   The Secured Noteholders are:

| | |
|---|---|
| Alpha Ventures | $20,000 |
| Nexit Ventures | $12,000 |
| Nif/T, LLC, LLC | $14,000 |
| Bruce Bourbon | $12,000 |
| Demetris Paraskevopoulos | $12,000 |
| Yannis Tsividis | $ 2,000 |
| Yannis Papananos | $ 1,000 |
| | |
| Total | $73,000 |

The Secured Notes are secured by the Debtor's patent portfolio.  The Secured Notes provide for the accrual of interest at the rate of 10% per annum with principal and interest to be paid at maturity. Scheduled maturity is June 30, 2015.  Debtor's counsel has reviewed the documentation associated with the Secured Notes and believes that the liens associated with those notes are (subject to the bankruptcy stay) fully enforceable.

The Convertible Notes issued in 2004 and 2008, discussed below, were intended to be secured by blanket liens on the Debtor's assets and such a lien was duly perfected through a filing with the Delaware Secretary of State in 2004.  As a matter of law, however, the perfection of that lien expired five years after the initial filing with the Delaware Secretary of State because no continuation statement

has ever been filed. As a consequence, the Debtor believes that the Convertible Note holders do not have a secured claim entitled to enforcement in this case and that the Secured Notes issued in connection with the pre-petition financing constitute the entirety of the secured debt enforceable against the Debtor's bankruptcy estate.

**B.    Unsecured Creditors**

Although all unsecured creditors have the same legal rights and will enjoy the same distribution in this bankruptcy case, they fall into three groups.

1.    Accounts Payable

While the Debtor remained in operation, it incurred debts that it was unable to pay on a current basis. Substantially all of these accounts payable are owed to consultants and independent contractors, most of whom served in management positions during the operating business phase of Theta's corporate life. Specifically, the most substantial accounts payable are owed to Nif/T, LLC for patent development fees and fees on account of services associated with raising funds for the Debtor; Sisois, for efforts as the general manager of the Athens, Greece subsidiary; Bruce Bourbon for his efforts as CEO, and Yannis Tsividis for his consulting services relating to the Debtor's intellectual property.

The Debtor believes that the accounts payable may be estimated as follows:

| | | |
|---|---|---|
| Arnold & Porter | $ | 48,788.02 |
| Blakely Sokoloff | $ | 24,794.49 |
| Bruce R. Bourbon | $ | 124,142.72 |
| Mikes Sisois[1] | $ | 672,500.00 |
| Nif/T, LLC, LLC | $ | 214,741.74 |
| Wilson Sonsini | $ | 19,941.55 |
| Yannis Tsividis | $ | 148,800.00 |
| | | |
| Accounts Payable | $ | 1,253,708.52 |

---

[1]    This claim is disputed and the subject of litigation. This estimate is provided in an attempt to provide information to creditors and is not an agreement respecting an amount owed to this claimant.

DISCLOSURE STATEMENT

Page 8

All of these creditors (other than the law firms) were closely associated with the Debtor. Apart from the law firms, the Debtor believes that these creditors agreed to defer payment on their debts until after the Debtor generated liquidity through the prosecution of its patent licensing program.

In 2014, when the Debtor was on the eve of commencing its patent licensing program, Sisois demanded payment and thereafter filed suit. In his suit, Sisois seeks 10% interest from the date his claims accrued; since the claims are a number of years old, the accrual of interest substantially increases the obligation. Since Sisois' consulting agreement did not provide for the accrual of interest, the Debtor contends that no interest is owed (the "Interest Dispute").

In the interest of fairness, the Debtor intends to apply the result of the Interest Dispute to all of the similarly situated claims of the other consultants: if it is determined that interest is owed to Sisois from the time of the accrual of the claims notwithstanding the absence of a contractual provision for it, then the Debtor will increase the claims of the other consultants by interest at the same rate and on the same terms.

### 2. Convertible Notes

The Debtor engaged in financing transactions in 2004 and 2008 in which it issued promissory notes convertible into Preferred Stock (the "Convertible Notes"). In the 2004 financing, the Debtor issued Convertible Notes in the face amount of $2.6 million to 13 holders; in the 2008 financing, the Debtor issued Convertible Notes in the face amount of $400,000 to 8 holders. The Convertible Notes provide for payment of interest at the rate of 2% over prime.

Upon a "Change of Control" event, the Convertible Noteholders are entitled to payment of interest and three times principal, but the Debtor does not believe that a "Change of Control" event has occurred. Likewise, no event which would give rise to the conversion of Convertible Notes into Preferred Stock has occurred.

The commencement of the Debtor's Chapter 11 case constitutes an Event of Default under the Convertible Notes, rendering them due and payable. Plan Schedule 3 presents a listing of the Convertible Noteholders and the amounts the Debtor believes are due to them, including interest through May 15, 2015. As reflected in Schedule 3, the Debtor believes that $3,157,577.83 is owed on the 2004 Convertible Notes and $ 456,382.28 is owed on the 2008 Convertible Notes.

3.  Executory (Ongoing) Contracts

The Debtor is a party to two executory contracts under which it received services in return for a percentage of the Debtor's ultimate recovery from the assertive patent licensing program. Those contracts are summarized in the table below.

| Counter-Party | Service | Percentage |
|---|---|---|
| Nif/T, LLC | Develop infringement substantiation and patent prosecution support | 6% |
| Bruce Bourbon | Corporate officer services and patent prosecution support | 1% |

Under the Plan of Reorganization, these contracts will be rejected and will have no further force or effect. As a matter of bankruptcy law, the counter-parties to these contracts may assert claims for damages relating to that rejection. It is not presently clear whether such claims, if asserted, would be allowed. On the one hand, the Debtor contends that the counter-parties took the risk that there would be no recovery from the assertive patent licensing program, and so no claim is appropriate. On the other hand, the counter-parties might argue that they are entitled to a claim for the reasonable value of the services they provided, especially since the Debtor does anticipate obtaining a recovery from the assertive patent licensing program (through the IP Contract) and is simply choosing to terminate these contracts now pursuant to its bankruptcy powers.

### C.     Equity Holders

The Debtor has Common and Preferred Stock; the Preferred Stock has two series: Series A Preferred and Series B Preferred.  Attached as Schedule 4 to the Plan of Reorganization is a listing of the existing common Stockholders and Preferred Series A and B Stockholders.

The Preferred Stock enjoys a Liquidation Preference and certain contractual anti-dilution protections.  The Liquidation Preference entitles the holders to receive a return of their investment, aggregating approximately $10.8 million, before there is any distribution to common Stockholders. (After they receive their Liquidation Preference, the Preferred Stock continues to participate on an as-converted to Common Stock basis.)

The anti-dilution provisions provide for an adjustment in the rate at which Preferred Stock is convertible into Common Stock based on certain formulas in the event that new stock is issued at a lower valuation.   The Exit Financing involves the issuance of new Series 1 Preferred Stock at a lower valuation, as discussed separately below.   The Plan gives effect to the contractual anti-dilution provisions triggered by that issuance.  The Plan also effects a conversion of all of the outstanding Series A and Series B Preferred Stock to Common Stock, after closing of the Exit Financing, based on the conversion rates computed per the terms of the Amended and Restated Certificate of Incorporation, and after giving effect to the anti-dilution adjustment that results from the issuance of the Series 1 Preferred Stock.

The consequence of implementing these two contractual provisions – anti-dilution and conversion – is referred to in the Plan as the "Stock Conversion" and is set forth in the table below.

DISCLOSURE STATEMENT

| | Initial Shares | Liquidation Preference | Current "As Converted" Shares | Current "As Converted" Percent | Current Effective Price | Adjusted Common Shares | Percent |
|---|---|---|---|---|---|---|---|
| Common | 3,769,713 | | 3,769,713 | 19.4% | | 3,769,713 | 1.9% |
| Series A | 6,260,331 | $ 0.8466 | 7,066,662 | 36.4% | $0.7500 | 43,138,959 | 21.6% |
| Series B | 6,412,855 | $ 0.8600 | 8,594,445 | 44.2% | $0.6417 | 52,405,149 | 26.3% |
| TOTAL | 16,442,899 | | 19,430,820 | 100% | | | |
| New Preferred (Series 1) | | | | | | 100,000,000 | 50.2% |
| TOTAL | | | | | | 199,313,821 | 100.0% |

Although Stockholders are offered an opportunity to vote on the Plan, the Debtor believes that the Plan and the bankruptcy laws do not impair the rights of the Stockholders with respect to the Stock Conversion. Rather, the Stock Conversion simply represents an implementation of the Stockholders' existing contractual rights among themselves. Likewise, the issuance of New Series 1 Preferred Stock is not a function of the bankruptcy laws: it is an exercise of the powers of Theta under otherwise applicable corporate law.

## VI. THE PLAN OF REORGANIZATION

### A. *Means of Implementing the Plan*

The Plan of Reorganization is premised upon entering into the IP Contract in order to monetize the Debtor's patents and implementing the Exit Financing to fund necessary payments to prosecute the IP Contract and maintain the patents until the assertive licensing program can generate revenues.

#### 1. Theta IP, LLC

Theta IP, LLC was formed to enable the monetization of the Patents. The members of Theta IP, LLC are Yannis Tsividis, Yannis Papananos, Nif/T, LLC, LLC, Bruce Bourbon, Demetris Paraskevopoulos and Robert Morse.

Theta IP, LLC is led by Demetris Paraskevopoulos, a principal of Nif/T, LLC and an individual who has been closely associated with Theta for many years. It will obtain, through its association with Nif/T, LLC, the ability to deploy the Infringement Substantiation and Nif/T, LLC's ongoing services in support of an assertive patent licensing program respecting the Patents. It has obtained from Theta's founders and the inventors of the Patents their willingness to support and participate in an assertive patent licensing program respecting the patents. As significantly, it has obtained the tentative agreement of a law firm that specializes in infringement litigation to prosecute the necessary litigation on a contingent fee basis, and has undertaken to obtain the funding for necessary litigation support from third parties, also on a contingent fee basis. Collectively, the foregoing is referred to as the "Infringement Support Infrastructure." The Debtor believes that the Infringement Support Infrastructure is complete, and that the assertive patent licensing program could be commenced immediately if Theta IP, LLC agreed to do so.

Conversely, it will be at least difficult and time-consuming, if not impossible, for the Debtor to commence an assertive patent licensing program and attempt to monetize the patents without the assistance of Theta IP, LLC. In general, the Debtor would be required to replicate the Infringement Support Infrastructure. Some aspects of the Infringement Support Infrastructure merely require the negotiation of agreements, although in the absence of an infusion of capital, all of those agreements must be structured as contingent fees; e.g., agreements with litigation counsel, with founders and inventors, with sources of funding for litigation expenses, etc.

An essential element of any assertive patent licensing program, however, is the Infringement Substantiation already prepared, and additional comparable efforts to be effected going forward. Nif/T, LLC has invested tremendous effort over several years in preparing the existing Infringement Substantiation which it exclusively owns: absent an agreement with Nif/T, LLC – such as the one already obtained by Theta IP, LLC – the Debtor would be required to recreate this work. In the absence

of capital, it might be impossible to do so; in any event, it would likely be expensive and time-consuming.

Thus, the Debtor concluded that if it could negotiate an agreement with Theta IP, LLC, it could promptly undertake an assertive patent licensing program to monetize its patents. Conversely, in the absence of an agreement with Theta IP, LLC, it was highly unlikely that the Debtor could effectively monetize its patents.

### 2. The IP Contract

The Debtor and Theta IP, LLC have entered into a contract (the "IP Contract") that requires confirmation of the Plan of Reorganization as a pre-condition. A copy of the IP Contract is Exhibit A to the Plan of Reorganization.

Under the IP Contract, Theta will transfer to Theta IP, LLC ownership of the Patents and exclusive discretionary control over the patents and the anticipated assertive patent licensing program, together with approximately $175,000. In return, Theta IP, LLC will undertake to manage and support an assertive patent licensing program, deploying the Infringement Support Infrastructure in support of it. Under the IP Contract, the proceeds of the assertive patent licensing program, net of the fees payable to contingent fee counsel and for litigation support expenses, will be divided 34.9% to Theta IP, LLC and 65/1% to the Debtor. The fees payable to contingent fee counsel and for litigation support expenses are expected to aggregate approximately 50% of gross recoveries from the assertive patent licensing program.

### 3. Exit Financing

The Plan of Reorganization is also predicated upon obtaining exit financing in the approximate amount of $400,000, of which approximately $150,000 is required upon confirmation of the Plan and an aggregate of $250,000 is required in 2015. The Exit Financing will be used to (a) repay the Secured Notes in full with interest; (b) pay the administrative claims against the estate, generally consisting of

post-bankruptcy fees of attorneys and other professionals; and (c) fund the payments to Theta IP, LLC required by the IP Contract. The budget for the use of the Exit Financing is attached hereto as Exhibit A. The amount of the Exit Financing may be increased as necessary to fund the foregoing expenses.

The Exit Financing will be raised from Participating Stockholders ("Participants") ratably with reference to their existing Stockholder investments. The aggregate amount of the Exit Financing shall be $400,000. In part it will be funded over time: more than half of it will be funded during 2015, the balance over the ensuing years. Forms of the Exit Financing documents are attached as Exhibit B to the Plan.

Each Participant in the Exit Financing shall fund its ratable portion of the Exit Financing (the "Participant's Financing") determined as a fraction the numerator of which is the Participant's aggregate pre-bankruptcy investment and the denominator of which is the aggregate pre-bankruptcy investment of all Participants (hereinafter the "Participant's Percentage.")

Each Participant shall purchase (a) "Exit Notes" aggregating about 75% of the Participant's Financing and (b) shares of Series 1 Preferred Stock purchased for 25% of the Participant's Financing which shall be equivalent to the Participant's Percentage of all Series 1 Preferred Stock. The Series 1 Preferred Stock shall have an aggregate Liquidation Preference equal to the aggregate pre-petition Liquidation Preference of the Series A and Series B Preferred Stock, that is, $10,815,052. Thus, if all holders of Series A and Series B Preferred Stock Participated in the Exit Financing, they would preserve their pre-petition Liquidation Preference through the Series 1 Preferred Stock. If less than all holders of Series A and Series B Preferred Stock Participate in the Exit Financing, those who do participate will share the pre-petition Liquidation Preference of those who do not participate. The Debtor anticipates that a substantial majority of preferred Stockholders will participate in the Exit Financing.

As noted, in addition to the Series 1 Preferred Stock, Participants in the Exit Financing will receive the Debtor's Exit Notes bearing interest at the rate of 8% per annum and payable from the first

distributions received by the Debtor under the IP Contract, prior to any distributions to general unsecured creditors.

### B. Plan Treatment

#### 1. Secured Creditors

Secured Creditors are assigned to Class 1 under the Plan. Theta believes that they are limited to the persons who funded that April 15th financing, identified and discussed above, in the aggregate principal amount of $73,000. The Secured Creditors will be paid in cash and in full on the Effective Date of the Plan from the proceeds of the Exit Financing. The Secured Creditors are deemed unimpaired, and their acceptance of the Plan is not required.

#### 2. Priority Creditors

The Bankruptcy Code affords a priority to certain types of unsecured claims, such as taxes. Claims entitled to statutory priority are assigned to Class 2 under the Plan. If there are any such claims, they will be paid in cash and in full on the Effective Date of the Plan from the proceeds of the Exit Financing. Priority claims are deemed unimpaired, and their acceptance of the Plan is not required. Theta believes that there are no unpaid priority claims.

#### 3. General Unsecured Creditors

As discussed above, the claims of general unsecured creditors are expected to aggregate about $5 million. All of those claims are assigned to Class 3 and treated in the same fashion. The claims of unsecured creditors are impaired under the Plan, and they are entitled to vote to accept or reject the Plan.

The claims of the Convertible Noteholders are identified in Schedule 3 to the Plan and are Allowed in those amounts. If a Convertible Noteholder asserts a different claim amount, it must file a Proof of Claim with the Bankruptcy Court. Exclusive of Sisois, the claims associated with the Accounts Payable have been Scheduled as acknowledged and Allowed in the amounts set forth above. If the

holder of an Account Payable asserts a different claim amount, it must file a Proof of Claim with the Bankruptcy Court.

In order to hold an Allowed claim in this case, (a) Mikes Sisois must file a Proof of Claim, and (b) with respect to the rejection of their executory contracts only, Nif/T, LLC and Bruce R. Bourbon must file a Proof of Claim. Theta reserves the right to object to any Proof of Claim.

Under the Plan, unsecured claims will be paid only from the proceeds of the successful monetization of Theta's patents, if any, pursuant to the IP Contract. If proceeds of the assertive patent licensing program are distributed to Theta, those funds will first be dedicated to paying Theta's ongoing operating expenses and then to repaying the Exit Notes given as part of the Exit Financing. After the Exit Notes have been repaid in full, with interest, additional funds received under the IP Contract will be distributed on account of the general unsecured claims.

The distributions will be ratable based on claim amounts; that is, equal pennies on the dollar. The distributions to general unsecured creditors will continue until (a) prosecution of the monetization of the patents under the IP Contract has been concluded, or (b) general unsecured claims have been paid in full, together with post-bankruptcy simple interest at the rate of 0.5% per year. There can be no assurance that general unsecured creditors will recover anything, let alone some specified level of recovery.

4.    <u>Preferred and Common Stockholders</u>

Under the Plan, Series A Preferred Stockholders are assigned to Class 4A and Series B Preferred Stockholders are assigned to Class 4B, although the treatment of those two classes is substantially the same. Common Stockholders are assigned to Class 4C. Although it can be argued that the equity holders are not impaired under the Plan, they are all invited to vote on the Plan so as to render that argument unnecessary.

As discussed above, the issuance of new Series 1 Preferred Stock will trigger anti-dilution provisions in the Series A and Series B Preferred Stock, resulting in a substantial increase in the as-converted holdings of the holders of Series A and Series B Preferred Stock, and the conversion of same into Common Stock based on the conversion rates established in the Amended and Restated Certificate of Incorporation.

Theta notes that the rights of the holders of Series A and Series B Preferred Stock are not identical, and that one class could argue for differing treatment than the other class. To some extent that difference is accommodated in the differing rates for conversion to Common Stock. To a greater extent, however, the differences are not accounted for because of the very substantial overlap among the holders of Series A and Series B Preferred Stock. If the members of either Class oppose this combined treatment, they should vote against the Plan.

Under the Plan and as a consequence of the Stock Conversion, the pre-bankruptcy Preferred Stockholders become Common Stockholders. After the general unsecured creditors have been repaid in full, with interest, additional funds received under the IP Contract will be distributed to the holders of the new Series 1 Preferred Stock on account of the Liquidation Preference in the amount of $10,815,052. After that Liquidation Preference has been paid in full, any additional funds received under the IP Contract will be distributed as equal dividends per share on the Common Stock and the Series 1 Preferred Stock.

There can be no assurance that the Liquidation Preference will be paid in full or that Common Stockholders will recover anything, let alone some specified level of recovery.

In addition to the impact on Stockholders resulting from the Stock Conversion and the issuance of new Series 1 Preferred Stock, the Plan makes express something that is at least implied by non-bankruptcy law: nothing will be distributed to or for the benefit of Stockholders until all creditors (Exit Financing and general unsecured creditors) have been paid in full with applicable interest.

Theta believes that its treatment of Stockholders is entirely consistent with their rights under otherwise applicable non-bankruptcy law. As a matter of bankruptcy law, Theta believes that the Stockholders are not "impaired," but Theta thinks it more prudent to request their affirmative acceptance through their vote on this Plan.

## VII. TAX CONSEQUENCES

It is the Debtor's best estimate that confirmation of the Plan will generally be tax neutral for creditors, Stockholders and the Debtor.

All creditors are to be paid in full under the Plan, at least if there are sufficient proceeds from the monetization of the patent portfolio. From the perspective of the Debtor and of the creditor, the payments to be made under the Plan will likely have precisely the same tax attributes and consequences as they would have had, if the claims had been timely paid in the absence of the bankruptcy case: if the payment by the Debtor otherwise would have been taxable income to the creditor, it will be taxable income when made under the Plan; if it would have been a non-taxable return of capital to the creditor, it will remain non-taxable under the Plan.

There are three circumstances in which the tax consequences may differ. First, payments may be made or received in a different tax year as a result of the deferrals provided by the bankruptcy process, which may have an effect on certain taxpayers. Second, since creditors are to be paid in full under the Plan, there will likely be tax consequences to any creditors that have already taken a bad debt deduction with respect to any obligation of the Debtor. Finally, if the Debtor is unsuccessful in repaying all creditors in full, they may be able to assert a bad debt tax deduction for the shortfall, depending on their tax circumstances.

Likewise, it seems likely that the issuance of stock pursuant to the anti-dilution provisions, the conversion of Preferred Stock into Common Stock and the issuance of new Series 1 Preferred Stock will not constitute taxable events.

**Creditors and Stockholders are urged to obtain and rely upon the advice of their tax professionals, rather than the foregoing summary.**

## VIII. ALTERNATIVES TO THE PLAN

Theta believes that the Plan provides creditors and Stockholders with the greatest value that can likely be obtained on their respective claims.

The alternative to confirmation of the Plan is liquidation of the Estate under Chapter 7 of the Bankruptcy Code. The "best interest" test of Bankruptcy Code Section 1129(a)(7)(A)(ii) requires that a plan provide to each dissenting member of each impaired class a recovery that is at least as good as would be obtained if the bankruptcy estate were liquidated under Chapter 7 of the Bankruptcy Code.

### A. *Liquidation under Chapter 7*

When a Chapter 11 case is converted to a case under Chapter 7 of the Bankruptcy Code, a Chapter 7 trustee is appointed to conduct the affairs of the estate. In applying the liquidation test of Bankruptcy Code Section 1129(a)(7)(A)(ii), the Bankruptcy Court must consider not only the accrued expenses of administration from the Chapter 11, but the Chapter 7 trustee's fees and expenses, and the fees and expenses of professionals likely to be retained by that trustee. Generally, no distribution is made in a Chapter 7 case until all assets of the Bankruptcy Estate and all claims have been liquidated, a process that can often take many months and sometimes years. Most importantly, a Chapter 7 trustee does not operate the business over which or she takes control except in very rare circumstances.

Theta believes that a Chapter 7 trustee would be highly unlikely to embark on the assertive licensing program. In addition, as noted above, it is unclear that anyone other than Theta IP could prosecute the assertive licensing program because Theta IP has control over the Infringement Infrastructure while anyone else would need to recreate it. A trustee might attempt to negotiate with Theta IP, but the Debtor believes that a trustee would be highly unlikely to obtain as advantageous an agreement as Theta obtained under the IP Contract, if the trustee could obtain any agreement.

Rather, a trustee would be likely to attempt to sell the patents. Since no target defendant has been sued or even received a demand letter, the Debtor believes that the Trustee would be unlikely to obtain a meaningful recovery for the sale of the patents.

A trustee can also pursue avoidance actions such as preferences and fraudulent transfer. The Debtor has enjoyed minimal revenues over the past four years, and consequently has not made any material transfers. The Debtor has analyzed the transfers which were made, and has concluded that they are not likely avoidable.

While the Debtor acknowledges that the outcomes are uncertain and speculative, the Debtor believes that under the Plan it is vastly more likely to obtain a recovery, and a substantially larger recovery, than would be obtained from a Chapter 7 bankruptcy liquidation.

## IX. FEASIBILITY

The Bankruptcy Code requires as a condition to the Plan's confirmation that the Bankruptcy Court find that the Plan is "feasible"; that is, that it is not likely to be followed by failure and liquidation. Although there are material risks, discussed below, the Debtor believes that the Plan is feasible and will likely be successfully implemented.

### A. *Grounds for Feasibility Finding*

Through its consultant, Nif/T, LLC, the Debtor has been engaged in efforts to commence the aggressive licensing program since 2009. In general, those efforts were driven by the requirements of prospective contingent fee counsel.

Contingent fee counsel in patent litigation must predictably make a tremendous investment in the case, an investment which necessarily is lost if the infringement claims are defeated. Prospective counsel, therefore, will insist on evaluating and performing due diligence on every critical element of the case before making the commitment.

Since 2009, counsel has thoroughly evaluated the relevant patent and satisfied itself that the patent is valid and enforceable. At counsel's insistence, outside engineers reverse-engineered the infringing product(s), demonstrating that they did, in fact, infringe upon Theta's patent and that there was no non-infringing alternative method to construct the product(s). Finally, outside economists prepared a rigorous report identifying the likely damages associated with the infringement. At the conclusion of this 5 year process, Nif/T, LLC had developed a compelling legal and factual case for the infringement claim and litigation.

As noted above, in 2014, immediately prior to the filing of Sisois' lawsuit, contingent fee counsel and a contingent fee funding source were prepared to embark upon the assertive patent licensing program. Nif/T, LLC has remained in contact with counsel and the prospective funding source, and understands that they are prepared to recommit to the project if the Plan of Reorganization is confirmed.

Thus, Theta believes that if the Plan is confirmed, it will be able to engage contingent fee counsel and a contingent fee funding source and, through Theta IP, LLC, promptly commence the assertive patent licensing program.

### B.    Risk Factors

In the near term, the most significant risk is that identified contingent fee counsel and the contingent fee funding source will decline to go forward. Nif/T, LLC believes that this risk is unlikely to arise, but there can be no assurance until there is a legally binding commitment, and that will not occur until after Plan confirmation. If contingent fee counsel or the contingent fee funding source refuse to go forward, it is possible that replacements could be identified and obtained, although this would attenuate the process of monetizing the patents, perhaps fatally so.

In the long term, the risks faced by Theta, its creditors and its Stockholders are the risks attendant upon patent litigation:    Litigation outcomes are inherently unpredictable due to judicial discretion and jury inconsistency. The key patent could be found invalid, the target defendants may be

found not to have infringed, or even if successful, the damages awarded may be materially less than anticipated. There can be no assurance that the assertive patent licensing program will actually generate a recovery to creditors or Stockholders.

That said, there are grounds to anticipate that the program will prove successful, and the willingness of the persons most knowledgeable about the program, the members of Theta IP, LLC, to dedicate their ongoing efforts, and the willingness of sophisticated Stockholders to fund the Exit Financing represent some support for that anticipation. Moreover, Theta does not believe that there is a viable alternative which might generate a recovery to creditors or equity holders.

# X. DISCLOSURE OF POST-CONFIRMATION MANAGEMENT

Theta's management and Board membership will not change as a result of the Plan of Reorganization. Theta's Chairman and CEO is Bruce R. Bourbon, its Secretary is Demetris Paraskevopoulos. The members of Theta's Board of Directors are Bruce Bourbon, Demetris Paraskevopoulos, Jack Carsten, and Robert Morse. Theta's officers and directors will receive no compensation for their services to Theta post-confirmation.

## VII. CONCLUSION

This document has been presented for the purpose of enabling you to make an informed judgment to accept or reject the Plan. You are urged to read the Plan in full and consult with counsel if you have questions. Theta believes that acceptance of the Plan is in the best interest of all creditors, and will provide the best recovery in this case. Theta urges creditors and equity holders to vote to accept the Plan.

DATED:  May 22, 2015  THETA MICROELECTRONICS, INC.


By:  _/s/  *Bruce R. Bourbon*   .
  Bruce R. Bourbon
  Chairman and CEO

Presented by:

ST. JAMES LAW, P.C.


By:   _/s/  *Michael St. James*   .
  Michael St. James
Counsel for the Debtor


Attachment


Budget for use of Exit Financing

# Theta Inc & LLC Budget

| | 1H'15 post Court approval | 2H'15 | 2016 | 2017 |
|---|---|---|---|---|
| **Paid by Theta Inc.** | | | | |
| BSTZ for THT-024 | 4,000 | - | - | - |
| BSTZ for THT-0xx | - | 3,000 | - | - |
| Patent maintenance 2015 & X'fer (1H15) | 4,300 | - | - | - |
| A&P pre pkge review | 750 | - | - | - |
| A&P agreement w/ SGR | 3,750 | - | - | - |
| A&P secure loan registration | 4,000 | - | - | - |
| A&P Exit fundraising docs | 4,000 | - | - | - |
| A&P Inc. - LLC agreeement | 5,000 | - | - | - |
| A&P misc 2015 | | 8,500 | - | - |
| A&P misc 2016 | | - | 8,500 | - |
| A&P misc 2017 | | - | - | 8,500 |
| M. St. James 2nd retainer | | - | - | - |
| J. Skaggs | | - | - | - |
| Theta Inc Administrative | | - | - | - |
| D&O 2015 | | - | - | |
| D&O 2016 | | - | 8,500 | - |
| D&O 2017 | | - | - | 9,000 |
| DE, CA, CT Corp 2015 | | 3,650 | - | - |
| DE, CA, CT Corp 2016 | | - | 3,650 | - |
| DE, CA, CT Corp 2017 | | - | - | 3,650 |
| Acc't & Tax Prep. 2015 | | 3,000 | - | - |
| Acc't & Tax Prep. 2016 | | - | 3,250 | - |
| Acc't & Tax Prep. 2017 | | - | - | 3,250 |
| *Paid to Theta IP LLC* | *45,000* | *70,000* | *30,000* | *30,000* |
| *Repayment of Secured Loan* | *74,825* | | | |
| | **145,625** | **88,150** | **53,900** | **54,400** |
| **Source of Income** | | | | |
| Secured Financing | | | | |
| Exit Financing - 1st tranche - June '15 (*) | 150,000 | | | |
| Exit Financing - 2nd tranche - November '15 (*) | | 100,000 | | |
| Exit Financing - 3rd tranche - June '16 (*) | | | 75,000 | |
| Exit Financing - 4th tranche - June '17 (*) | | | | 75,000 |